1

2

3

4                               UNITED STATES DISTRICT COURT

5                             NORTHERN DISTRICT OF CALIFORNIA

6

7    WHITTIER B. BUCHANAN,                      Case No. 20-cv-08593-WHO (PR)

              Petitioner,
8
                                                ORDER DENYING PETITION FOR
9         v.                                    HABEAS CORPUS, DENYING
                                                CERTIFICATE OF APPEALABILITY
10   BRIAN KIBLER,

11            Respondent.

12

13                                      INTRODUCTION

14         Petitioner Whittier B. Buchanan, a state prisoner incarcerated at R.J. Donovan Correctional

15   Facility, filed a pro se action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 raising

16   several claims and challenging the validity of several convictions in Alameda County Superior

17   Court.  ECF No. 26 (Petition).  I have carefully considered the claims and record and conclude that

18   his claims were reasonably denied by the state court.

19         Buchanan, who represented himself during trial, validly waived his *Miranda* rights, and

20   additionally conceded his *Miranda* objections before trial; the "show-up" identification procedure

21   was not unreliable; Buchanan's claims of prosecutorial misconduct are conclusory or otherwise

22   undone by evidence that Buchanan, not the prosecution team, presented the "prejudicial" evidence

23   in question; his claims of ineffective assistance of pretrial and appellate counsel fail to overcome

24   28 U.S.C. § 2254's "doubly" deferential standard; his due process claims lack merit or were

25   otherwise addressed by the trial court; and the jurors who allegedly committed misconduct were

26   dismissed or otherwise did not show any signs of bias.  *See generally* ECF No. 26.  Moreover, the

27   state court reasonably denied his claim of instructional error and *Ramos v. Louisiana*, 590 U.S. 83

28   (2020), which provides that state criminal defendants may be entitled to a unanimity instruction,

1    does not apply retroactively on federal habeas; Buchanan's objection to his consecutive sentences

2    is not cognizable on federal habeas; he fails to show error or prejudice as to his bifurcated

3    proceeding on his prior convictions; and he has not shown that his sentence under California's

4    habitual sexual offender statues constitutes cruel and unusual punishment. *Id.* For the reasons set

5    forth below, the petition for habeas relief is DENIED.

<div align="center">

**BACKGROUND**

</div>

7        In 2017, an Alameda County jury convicted Buchanan, who represented himself at trial, of

8    kidnapping to commit a sex offense (Cal. Pen. Code § 209(b)(1)); assault with intent to commit a

9    sex offense (Cal. Pen. Code § 220(a)(1)); and failure to register as a sex offender (Cal. Pen. Code

10   §§ 290(b), 290.018(b)). *See* ECF No. 36-22 (Appellate Opinion) at 2; ECF No. 36-18 (Reporter's

11   Transcript, Sept. 13, 2017, *Marsden* Hearing) at 35-50. The trial court found true the allegations

12   that Buchanan had five prior sex offense convictions. It sentenced him to a term of 60 years-to-

13   life. *Id.* After Buchanan appealed, the case was remanded, and he was resentenced to a term of

14   78 years to life. ECF No. 36 (Answer) at 13; *see* ECF No. 36-28 (Amended Sentencing Abstract).

15       On December 1, 2020, Buchanan filed a habeas petition in this court. ECF No. 1. The

16   Hon. Yvonne Gonzalez Rogers granted his request to stay the petition so he could exhaust his

17   claims in state court. *See* ECF No. 17; *Rhines v. Weber*, 544 U.S. 269 (2005). At Buchanan's

18   request, Judge Gonzalez Rogers reopened the case on July 25, 2023. ECF No. 28.

19   **A.      Facts Underlying Conviction[1]**

20       Buchanan was convicted after he kidnapped an intoxicated woman, Jane Doe, and

21   attempted to force her to perform oral sex on him. ECF No. 36-22 at 3. The evidence at trial

22   showed as follows: During an evening in 2017, the victim, Doe, spent the evening at a bar with

23   friends and then took an Uber car home. *Id.* The driver, a Caucasian man, drove her home. *Id.*

24   During her car ride, Doe realized she did not have her house keys and called her father, who had a

25   spare key. *Id.* After her Uber driver dropped her off, Doe waited on the front steps of her house.

26   A man, later identified as Buchanan, approached her and told her it was unsafe to stay there. *Id.* at

27

28   ───────────────

[1] Unless otherwise stated, the facts within this section are from the California Court of Appeal's opinion in *People v. Buchanan*, Case No. A153155 (Aug. 28, 2019). *See* ECF No. 36-22.

<div style="writing-mode: vertical">United States District Court<br>Northern District of California</div>

3-4. Mistakenly believing the man was her Uber driver, she followed Buchanan to his vehicle, a Chevy Astro van. *Id.* at 4. She asked Buchanan to drop her off at a nearby Safeway, where her father would meet her with her spare keys. *Id.* Buchanan agreed.

Instead, however, he drove the opposite direction to a wooded area, refused to let Doe exit the van, and put his hand on her mouth. *Id.* Doe was terrified; she offered Buchanan money and asked him not to hurt her. *Id.* Buchanan took the money and told Doe that she would have to perform oral sex on him. *Id.* Doe agreed to do so and asked him not to hurt her. *Id.* As Buchanan continued driving, Doe escaped from the van through a window. Buchanan attempted to pull Doe back inside but was unable to do so. *Id.* at 5. When Doe yelled for help, Buchanan looked at her angrily and drove away. *Id.*

A neighbor called 911 and police arrived shortly thereafter. ECF No. 36-22 at 5. Doe told police that she had escaped from a minivan and gave them a description of her assailant that matched Buchanan. *Id.* She also told police that she dropped her phone in the van. *Id.* Police apprehended Buchanan later that morning and Doe identified him during an in-field show-up. *Id.* In Buchanan's van, "police found Doe's phone, suspected methamphetamine, and a pipe with burn marks and residue." *Id.* Police interviewed Buchanan twice. *Id.* He first told police that he found Doe sitting in front of her house crying because she did not have her house keys. *Id.* at 5. He claimed that Doe talked to him about her drinking problems and mental health issues. *Id.* at 5-6. He stated that the van did not move from where it was parked, and the door was never closed. *Id.* at 6.

During his second interview with police, Buchanan stated that he saw Doe crying and thought she was attractive. ECF No.36-22 at 6. When Doe entered Buchanan's van, she told him that she had been raped and forcibly orally copulated. *Id.* She asked Buchanan to drive her home and offered him money to do so. *Id.* She told Buchanan that she had mental issues and issues with drinking. *Id.* Buchanan stopped the van at some point because he was "tired of driving," and he spoke to Doe while she remained in the backseat. *Id.* Doe offered to have sex with Buchanan and perform oral sex, but her demeanor kept on changing and he began to worry that she was not serious. *Id.* He eventually told Doe to leave his van, and she began yelling for help. *Id.* He drove

3

1    away.  *Id.*

2        At trial, Buchanan provided trial testimony similar to his second police interview with

3    some added details, including that Doe brought and smoked the methamphetamine found in his

4    van.  ECF No. 36-22 at 6.  He also testified that he was not attracted to Doe, and a family friend

5    testified as a character witness on his behalf.  *Id.*

6        Gyretta Doe, who accused Buchanan of rape 22 years earlier, also testified at Buchanan's

7    trial.  ECF No. 36-10 (Trial Transcript, Vol. 7) at 40.  Gyretta Doe first met Buchanan at a park,

8    and they became friends.  *Id.*  One evening, on Gyretta Doe's birthday, Buchanan called her and

9    invited her out to a bar, where she had two drinks.  *Id.* at 44-45.  She was not interested in having

10   a sexual relationship with Buchanan at the time.  *Id.* at 45.  After she left the bar, Gyretta Doe

11   wanted to smoke marijuana and Buchanan accompanied her back to her apartment.  *Id.*  They

12   stopped to pick up liquor on the way.  *Id.*  As they sat on Gyretta Doe's couch smoking a joint,

13   Doe received a call from her boyfriend and Buchanan became "drunk and obnoxious," touching

14   her vagina with his finger.  *Id.* at 47-48.  She told him to calm down and to leave if he could not

15   "act correctly."  *Id.* at 48.  Buchanan told her he was too drunk, so she told him to sleep it off and

16   went into her daughter's bedroom, which had bunk beds.  *Id.* at 48-49.  She closed the door behind

17   her.  *Id.* at 49.

18       Buchanan let himself into the room shortly thereafter.  ECF No. 36-10 at 49.  Gyretta Doe

19   told him to go sleep in the other room, but he instead tried to kiss her.  *Id.* at 50.  When she pushed

20   him away, Buchanan grabbed her, asked if she thought he was "playing," and told her she was

21   going to do what he said.  *Id.* at 50-51.  He placed his body on top of Gyretta Doe, bit down hard

22   on her breast, and began to sexually assault her.  *Id.* at 51-52.  Gyretta Doe went into "survival

23   mode" and stopped resisting.  *Id.* at 53.  Buchanan's demeanor changed multiple times throughout

24   the encounter.  At some point, he pulled out his penis and "patted" Gyretta Doe's head softly, but

25   suddenly began threatening her and raped her a second time, grabbing Gyretta Doe by the neck.

26   *Id.* at 53-54.  Buchanan later placed his mouth on Gyretta Doe's vagina and asked her to get down

27   on the floor so he could rape her from behind.  *Id.*

28       Gyretta Doe testified that she believed the assault went on for several hours.  ECF No. 36-

4

10 at 55.  When Buchanan attempted to penetrate her anally, Gyretta Doe told him that she urgently had to use the restroom.  *Id.* at 56.  Buchanan told her that she could get up to use the restroom but "that's it."  *Id.*  Gyretta Doe walked toward her bathroom, which was near her front door, but instead ran upstairs to her neighbor's house to call the police.  *Id.* at 57.

**B.     Exhibits on Habeas**

Buchanan attached several exhibits to his first amended petition, including a Ninth Circuit order denying his petition for rehearing in Case No. 17-cv-05167-WHA (a 42 U.S.C. § 1983 action he had filed regarding his incarceration at Santa Rita Jail); Buchanan's declaration raising several allegations regarding one of his pretrial defense attorneys, Sylvia Cediel; photographs of the inside and outside of a van, presumably Buchanan's van; copies of the Berkeley Police Department's reports detailing the confiscation of a methamphetamine pipe and the photos and samples taken from Buchanan's van following the incident; Alameda County Superior Court orders for preservation of property and allow Cediel's inspection of a Chevy Astro van in Case No. 17-cr-013796; a transcript of a voicemail from Jane Doe to her father; several pages from the Reporter's Transcript in the underlying criminal case; several letters sent to Buchanan by his appellate attorney, William Capriola; a receipt for a California Penal Code section 290 registration in Richmond, California; a document titled "Pro-Per Inmate Phone Information" with Buchanan's name, a pin number, and a notation that he was authorized to call Walt Stannard; motions titled "Defendant Whittier Buchanan is being denied pro per status as he is not able to phone his investigator," and "D.A. Hernandez Violated Court Rules by Allowing Witnesses to Testify Observe the Testimony of Jane Doe," both filed October 23, 2017 in Alameda County Superior Court by Buchanan; a message from Buchanan to the Alameda County Sheriff's Office letting them know that his phone pin number did not work; a copy of a letter from Capriola to the Alameda County Superior Court requesting clarification or correction of Buchanan's sentencing abstract; a copy of the information filed in Buchanan's criminal case, a partial transcript from an interview with one of the victims, and other documents the Court was unable to identify.  ECF No. 26 at 49-115.

Respondent submitted various exhibits, including the Clerks Transcript and Reporter's

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Transcript from Buchanan's criminal trial; briefs, supplemental briefs, and petition for rehearing

2   on appeal for *People v. Buchanan*, Case No. A153155; motions to augment the record and to

3   examine confidential documents filed by Buchanan's appellate attorney with the Court of Appeal;

4   the Court of Appeal's opinion and an order modifying its opinion and denying rehearing in that

5   matter; Buchanan's petition for review in the California Supreme Court in *People v. Buchanan*,

6   Case No. S258214; the California Supreme Court's order denying review in that matter; petitions

7   for writ of habeas corpus and docket sheets for *In re Whittier Buchanan on Habeas Corpus*, Case

8   Nos. S256739 and S273421; and minutes of Buchanan's January 24, 2020 resentencing and

9   amended abstracts of judgment. *See generally* ECF No. 36.

10                          **STANDARD OF REVIEW**

11          Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court

12   may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the

13   judgment of a State court only on the ground that he is in custody in violation of the Constitution

14   or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted

15   with respect to any claim that was adjudicated on the merits in state court unless the state court's

16   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

17   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

18   of the United States; or (2) resulted in a decision that was based on an unreasonable determination

19   of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

20          "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

21   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

22   the state court decides a case differently than [the] Court has on a set of materially

23   indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the

24   'unreasonable application' clause, a federal habeas court may grant the writ if the state court

25   identifies the correct governing legal principle from [the] Court's decisions but unreasonably

26   applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court

27   may not issue the writ simply because that court concludes in its independent judgment that the

28   relevant state court decision applied clearly established federal law erroneously or incorrectly.

1    Rather, that application must also be unreasonable." *Id.* at 411.  A federal habeas court making

2    the "unreasonable application" inquiry should ask whether the state court's application of clearly

3    established federal law was "objectively unreasonable." *Id.* at 409.

**DISCUSSION**

5    Buchanan raises numerous claims, which the Court addresses in turn.[2]

6    **A.    *Miranda* Claims**

7    Buchanan argues that police twice violated his constitutional rights when they interviewed

8    him without giving him *Miranda* warnings.  ECF No. 26 at 32.  He also alleges that he asked for

9    an attorney but was not provided with one.  *Id.* at 32-33.

10    **1.  Police Interviews**

11    Shortly after Doe escaped from Buchanan's van, Buchanan was stopped by the Berkeley

12    Police Department, handcuffed, and placed in front of a police car.  ECF No. 36-4 at 104-07.

13    Officer Kelvin Gibbs approached Buchanan and started speaking to him.  *Id.* at 107-08.  Gibbs

14    told Buchanan that he was not under arrest but, due to the nature of the crimes being investigated,

15    Gibbs would read him his *Miranda* rights.  *Id.* at 108.  Gibbs did so and asked Buchanan whether

16    he still wanted to speak to him.  *Id.* at 109.  Buchanan said yes.  *Id.*  Shortly thereafter, Buchanan

17    was transported to the police station, where he was again interviewed by Gibbs; the second

18    interview took place approximately 20 minutes after the first.  *Id.* at 112-14.  Gibbs reminded

19    Buchanan of his *Miranda* rights before interviewing him the second time.  *Id.* at 112.  Buchanan

20    affirmed that he understood his rights and spoke to Gibbs.  *Id.*  Buchanan did not mention an

21    attorney during the conversation.

22    The next day, Buchanan was interviewed by a different detective, Detective Darren

23    Kacalek.  ECF No. 36-4 at 149.  The interview was conducted in the afternoon at the Berkeley

24    Police Department jail.  *Id.*  Buchanan was escorted to an interview room.  Kacalek asked

25

26    [2] As noted throughout this Order, Respondent argues that some subclaims are unexhausted due to Buchanan's failure to allege specific federal constitutional errors when he raised them in the
27    California Supreme Court.  *See Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).  As Respondent does not seek dismissal and Buchanan does not raise any colorable unexhausted claims, the Court finds that the issue is moot.  *See* 28 U.S.C.§ 2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 623-24
28    (9th Cir. 2005).

United States District Court
Northern District of California

Buchanan whether anyone had read him his rights, and Buchanan responded:  "I have the right to remain silent, anything I say can and will be used against me in a court of law.  Blah – blah – blah – blah – blah."  ECF No. 36-2 at 108.  Then, the following interaction occurred:

> **Q:**  You have the right to a presence of an attorney.  You remember all those rights?
> **A:** Those rights, yeah.
> **Q:**  You need to talk about any- could – you want me to go over those again?
> **A:**  No.
> **Q:**  You understand them?
> **A:**  Yeah.
> **Q:**  Okay. Um, so I . . . you know . . .
> **A:**  That's why I thought I would have an attorney here.  Because, uh . . .
> **Q:**  Well no right now we're – we're here – I'm trying to answer some of those questions that you have.
> **A:**  Right.
> **Q:**  As far as what your charges are and everything.
> **A:**  Okay.  Okay.
> **Q:**  Um, part of this is you know just like anything, I know you – know you've been through this.
> **A:**  Mm-hm.
> **Q:**  Um, before.  There's two sides to every story, right?
> **A:**  Yeah.

ECF No. 36-2 at 108.  Kacalek continued the conversation with Buchanan, who began sharing his whereabouts shortly before the incident.  *Id.* at 108-14.  He then demanded to know why he was there:

> **A:**  So, wait, yeah, you know what? . . . So that was a good question too. 'Cause they asked me what time did you run into the, uh, Asian girl I presume in question.  And you still haven't answered that one yet so I guess I'm right.
> **Q:**  Oh, we'll get there.
> **A:**  . . . and I assume I wanna know now.
> **Q:**  Yeah.
> **A:**  I wanna know now.
> **Q:**  Okay.
> **A:**  I wanna know now.
> **Q:**  We're – we're . . .
> **A:**  Otherwise – I wanna know now.
> **Q:**  You wanna know what?
> **A:**  Is – is that why I'm sitting here because of her?

8

Q: Yes.
A: Thank you.
Q: That's simple, well . . .
A: It's so easy 'cause otherwise I was about to say, 'Get me a fuckin' attorney.'

ECF No. 36-2 at 113-14.

## 2. Trial Court Ruling

Buchanan was initially represented by Public Defender Sylvia Cediel, who challenged the admissibility of the statements made during Buchanan's last interview, arguing that Buchanan had invoked his right to counsel. ECF No. 36-4 at 206-11. The trial court heard arguments from the parties and considered whether Buchanan's statements, "taken in isolation, . . . and then combine[d], in any way . . . convey an unequivocal and unambiguous assertion of his rights." *Id.* at 211. After reviewing the video of the interrogations, the Court stated as follows:

> The conversation begins with a reference to his earlier *Mirandized* statement which I have already ruled is admissible because it was an intelligent, voluntary and knowing waiver of the *Miranda* rights . . . As it relates to the second statement, we are in a different location, different time frame, two different officers. But the officer who comes in, Darren Kacalek . . . begins a conversation with the defendant about his constitutional rights. The defendant then begins to recite some portions of the *Miranda* warning, and the officer specifically asked him, 'Do you need me to reiterate or to state those admonitions again?' And the defendant says, 'No.' Then he makes reference to the fact that, 'I thought an attorney would be here.' And that's what gave the Court pause, and I did not want to depend on the transcript but the inflections of the voice, whether conversation continued without interruption, whether there was any opportunity for the defendant to make an unequivocal and unambiguous assertion of his rights to have an attorney present. The defendant continued dialogue when the officer said, 'No, I'm here to answer your questions.' And then they allow the defendant basically to continue talking almost without interruption on several occasions where he gives quite a bit of information. Further into the tape, there is another reference to an attorney, and that's after the defendant, it appears, wants some information from the officers about why they are focused on the young girl . . . I listened to that probably several times because I wanted to make sure the inflection was such that I understood whether the defendant was asking for a lawyer or whether he was referencing 'well, this is what I would have done if you didn't answer my question.' The officer allowed the defendant to continue talking, and the conversation becomes very jovial. It's pretty focused. The defendant is clearly trying to make sure the officers know his version of the events that night. The tone and tenor of the conversation doesn't change until later on during the discussion when the secondary officer, who is present and doing the interview, interrupts. . . . And so it was clear that he wanted an opportunity to

give his version of the facts. There was no coercion or any interruptions. And if he wanted counsel, it appeared that there was an opportunity for him to unequivocally make that request, but he pretty much keeps the conversation going.

And the citations that I provided counsel previously that I was looking at in terms of unequivocal, unambiguous assertions of the right to counsel, whether there was any malfeasance on the officer's part to in any way frustrate that request, and whether there was any clear indication from the defendant that he wanted to assert his right for a lawyer, which would have required that the officer stop talking to the defendant. For all of the reasons that I have shared thus far – looking at listening for inflection, looking at body language, the comfort level of the defendant, the fact that the officers allow him to speak quite openly and freely without interruption, and that there was no point in the conversation where he indicated that he wanted a lawyer present, that he did not want to answer any further questions without a lawyer present, and that there was an unequivocal invocation of his Sixth Amendment rights – it appears that the conversation, as I stated, goes on for quite some length.

A better practice by the officers would have been to obtain a written waiver form, to have the defendant sign it, and even though they were aware of the earlier admonition, for their purposes, as they were new officers, to have obtained that. But, again, the defendant basically jumped in and started reciting his rights to the officers. And so they were from that perspective, and based on the officers' testimony which went uncontroverted, felt that the defendant knew his constitutional rights, didn't want a read admonition, and the conversation became a very open and long colloquy of what had occurred. And the officers didn't really interrupt until they had follow-up questions after defendant was allowed to talk. There were portions of the tape where the defendant has voluntarily shared information about other episodes or other circumstances. The officers would then try to get him focused back to the conversation and then not interrupt again. So, based on the totality of my review of the DVD, looking at body language, inflection, conversation, there was not an unequivocal and unambiguous request for counsel, and therefore the statement is admissible subject to redactions with regards to references to any priors, parole status.

ECF No. 36-6 at 14-18.

### 3. Analysis

Buchanan contends that the trial court erred in admitting his statements to police because he was not *Mirandized* and was interviewed after he invoked his right to counsel. ECF No. 26 at 32. The California Supreme Court denied Buchanan's *Miranda* claim in a summary opinion. *See* ECF No. 36-27 at 115.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in

10

1    evidence. *Miranda* requires that a person subjected to custodial interrogation be advised that "he

2    has a right to remain silent, that any statement he does make may be used as evidence against him,

3    and that he has a right to the presence of an attorney." *Miranda v. Arizona*, 384 U.S. 436, 444

4    (1966). The warnings must precede any custodial interrogation, which occurs whenever law

5    enforcement officers question a person after taking that person into custody or otherwise

6    significantly depriving a person of freedom of action. *Id.* The United States Supreme Court has

7    eschewed per se rules mandating that a suspect be re-advised of his rights in certain fixed

8    situations in favor of a more flexible approach focusing on the totality of the circumstances. *See*

9    *Wyrick v. Fields*, 459 U.S. 42, 48-49 (1982) (per curiam); *United States v. Rodriguez-Preciado*,

10   399 F.3d 1118, 1128 (9th Cir.), amended, 416 F.3d 939 (9th Cir. 2005) (upholding introduction of

11   statement where defendant was interviewed one day after *Miranda* warnings were issued).

12        To the extent that Buchanan argues he was not *Mirandized*, the state courts had ample

13   evidence to conclude otherwise, and their conclusions are presumed correct without any clear or

14   convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). The record shows that

15   Buchanan was *Mirandized* prior to his first interview and was reminded of his rights prior to each

16   subsequent interview. Even assuming the *Miranda* warnings given by Kacalek prior to his

17   interview of Buchanan were insufficient, the prior warnings would have been sufficient to support

18   the trial court's conclusion. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118 (9th Cir.

19   2005) (affirming the rejection of *Miranda* claim where suspect was *Mirandized* prior to formal

20   arrest one day earlier and re-interviewed without additional warnings where no evidence existed to

21   show that effectiveness of prior warnings had diminished).

22        As noted, Buchanan also argues that he invoked his right to counsel. After a suspect

23   validly waives his *Miranda* rights, a subsequent invocation of the right to counsel halts

24   interrogation only when it is clear and unambiguous. *Davis v. United States*, 512 U.S. 452, 459-

25   61 (1994). Officers are not required to clarify an ambiguous statement. *Id.* at 461-62. The trial

26   court reasonably found that Buchanan had waived his *Miranda* rights and that each reference to

27

28

United States District Court
Northern District of California

1  counsel was qualified or equivocal, and therefore did not require officers to cease interrogation.[3]

2      Buchanan's first alleged invocation – a statement that he thought an attorney would be

3  there – did not explicitly request the presence of an attorney, and Buchanan did not follow up and

4  request counsel after Kacalek interrupted him and said "[w]ell, no," in response.  ECF No. 36-2 at

5  108.  The trial court reasonably concluded that the statement did not amount to an unambiguous

6  invocation of counsel.  *See Davis*, 512 U.S. at 462 (finding that the statement "[m]aybe I should

7  talk to a lawyer" was not unequivocal request for counsel); *Sechrest v. Ignacio*, 549 F.3d 789, 807

8  (9th Cir. 2008) (finding suspect's statement that he had spoken to an attorney who advised him to

9  "keep his mouth shut" was not unambiguous request for counsel).

10      Similarly, Buchanan's second reference to an attorney was clearly preceded by "otherwise

11  I was about to say," ECF No. 36-2 at 114, which the trial court reasonably interpreted as

12  Buchanan's attempt to say, "'well, this is what I would have done if you didn't answer my

13  question.'"  ECF No. 36-6 at 16.  The statements at issue are also clearly distinguishable from

14  cases in which federal courts have found a clear invocation of counsel.  *See Sessoms v. Grounds*,

15  776 F.3d 615, 619 (9th Cir. 2015) (finding clear invocation where suspect asked, "[t]here wouldn't

16  be any possible way that I could have . . . a lawyer present while we do this?" and then stating "my

17  dad asked me to ask you guys . . . uh, *give me a lawyer*") (emphasis added); *Anderson v. Terhune*,

18  516 F.3d 781, 787 (9th Cir. 2008) (finding unreasonable state court's conclusion that suspect's

19  statement, "I plead the Fifth," was not invocation of right to silence); *Garcia v. Long*, 808 F.3d

20  771, 780 (9th Cir. 2015) (finding that suspect's "no" response to officer's question "do you wish

21  to talk to me?" was unambiguous invocation of his right to silence).  Under these circumstances,

22  the California Supreme Court could reasonably deny Buchanan's claim that he invoked his right to

23  counsel.  *See DeWeaver*, 556 F.3d at 1002.

24      The state court's rejection of this claim was reasonable and is entitled to AEDPA

25  deference.  This claim is DENIED.

26

27  ───────────────

28  [3] Buchanan also appears to have waived his *Miranda* objections at trial.  *See* ECF No. 36-7 at 74
   ("The Court: [S]o you are indicating that agree that [the statement] was pursuant to a valid
   *Miranda* and was voluntary[?].  ¶  Mr. Buchanan: Yes, Judge.").

**B.      Identification Procedures**

Buchanan contends that he was subjected to an "[i]llegal identification" when he was subjected to an in-field show-up on the grounds that he did not have counsel and that it was unduly suggestive. ECF No. 26 at 33-34. The claim was denied by the California Supreme Court in a summary opinion. ECF No. 36-27 at 115.

Buchanan has not shown that the state court's denial of his claim was unreasonable. At the outset, he has not shown he was entitled to the presence of counsel before a show-up could be conducted. *See United States v. Hayes*, 231 F.3d 663, 672 n.4 (9th Cir. 2000) (noting that pre-prosecution activities generally do not give rise to the Sixth Amendment's right to counsel). Moreover, the field show-up identification procedure employed by police in this case was similar to those validated by the Ninth Circuit in prior cases. *See, e.g., United States v. Bagley*, 772 F.2d 482, 492-93 (9th Cir.1985); *United States v. Kessler*, 692 F.2d 584, 585 (9th Cir.1982). Buchanan also fails to show that the identification was unreliable or gave rise to potential misidentification. The testimony at trial showed that Buchanan was stopped by police after the victim gave them a description of his van, police found the victim's phone in Buchanan's van, and Buchanan admitted multiple times that he had been with the victim during the relevant time period. *See Neil v. Biggers*, 409 U.S. 188, 198-201 (1972) (courts must assess identification procedure on case-by-case basis and consider whether it created a substantial likelihood of misidentification).

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. This claim is DENIED.

**C.      Ineffective Assistance of Pretrial Counsel**

Buchanan argues that attorney Cediel, who was assigned to represent Buchanan but was relieved before trial, rendered ineffective assistance of counsel on various grounds, including by: pushing Buchanan to waive his right to a speedy trial; pushing him to plead guilty;[4] failing to object to the introduction of photos of the inside of his van; turning over discovery to the prosecutor; failing to prevent the sale of his van; allegedly purchasing his van; and visiting the

---

[4] Buchanan also alleges that Cediel failed to offer him a plea deal. The prosecutor offered only one plea deal throughout the proceedings, and it was restated on the record in Buchanan's presence. *See* ECF No. 36-4 at 100-01.

1    courtroom and courthouse after she was relieved as counsel on his case. ECF No. 26 at 5-14. He

2    also argues Cediel was ineffective by failing to obtain transcripts of the trial for Buchanan's prior

3    conviction in order to impeach the victim, Gyretta Doe, who testified against him at the underlying

4    trial. *Id.* The California Supreme Court denied the claim in a summary opinion. ECF No. 36-27

5    at 115.

6    The Ninth Circuit has recognized that a criminal defendant who has waived their Sixth

7    Amendment right to an attorney at trial may nevertheless raise claims of ineffective assistance of

8    counsel against their attorneys for the work they performed before the right to counsel was

9    waived. *See Arredondo v. Neven*, 763 F.3d 1122, 1137 (9th Cir. 2014). A claim for

10    ineffectiveness of counsel in violation of the Sixth Amendment is shown where a petitioner

11    establishes, first, that his counsel's performance fell below an "objective standard of

12    reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668,

13    687-88 (1984), and not simply that "it deviated from best practices or most common custom."

14    *Harrington v. Richter*, 562 U.S. 86, 105 (2011). "A court considering a claim of ineffective

15    assistance must apply a 'strong presumption' that counsel's representation was within the 'wide

16    range' of reasonable professional assistance." *Id.* at 104.

17    Second, a petitioner must establish that he was prejudiced by counsel's deficient

18    performance, meaning "there is a reasonable probability that, but for counsel's unprofessional

19    errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The

20    appropriate question is "whether there is a reasonable probability that, absent the errors, the

21    factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "The likelihood of a

22    different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

23    The standards of 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when

24    the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (quotations and

25    citations omitted). "[I]n reviewing the work of their peers, federal judges must begin with the

26    'presumption that state courts know and follow the law.'" *Dunn v. Reeves*, 594 U.S. 731, 739

27    (2021) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)). The pivotal question is whether

28    the state court's application of the highly deferential *Strickland* standard was unreasonable.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Harrington*, 562 U.S. at 105.

2       **1. *Marsden* Hearing**

3       Buchanan appears to argue that the trial court's grant of his *Marsden*[5] motion proves that

4 the trial court concluded that Cediel provided ineffective assistance. The Court notes that

5 Buchanan does not provide the sealed transcripts from the *Marsden* hearings, during which the

6 trial court considered whether Cediel's removal was warranted. However, the record shows that

7 the Court granted Buchanan's motion after Buchanan's relationship with Cediel deteriorated

8 following Buchanan's accusations and multiple motions to relieve her as counsel. Shortly before

9 trial was scheduled to begin, Cediel notified the Court that an attorney forwarded her a letter in

10 which Buchanan threatened that if the Court did not remove Cediel as his attorney, he would "get

11 sick and . . . 'accidentally' . . . vomit on her." ECF No. 36-5 at 6. Later, Buchanan made another

12 motion for the substitution of counsel, which the Court granted. The Court summarized the ruling

13 on the record as follows:

14          The Court ruled that the relationship between the defendant and
15          counsel has become substantially impaired, and by continuing with
         original counsel, the embroilment was such that an irreconcilable
16          conflict would affect counsel's ability to represent the defendant, and
         that ineffective representation is likely to result not because of
17          counsel's conduct necessarily, but because of the embroilment.

18    ECF No. 56-6 at 144-45 (emphasis added). Accordingly, there appears to have been no

19 finding of ineffective assistance of pretrial counsel.

20       **2. Miscellaneous Challenges to Cediel's Conduct**

21       To the extent that Plaintiff challenges specific conduct by Cediel, the Court concludes that

22 he has not shown the state court's denial of his claims was unreasonable. For example, even

23 assuming Buchanan's allegations are true, Buchanan has not shown that Cediel's advice that he

24 should consider waiving his right to a speedy trial or enter a guilty plea constituted ineffective

25 assistance of counsel, much less prejudiced Buchanan, who did not waive his right to speedy trial

26 or enter a guilty plea while Cediel represented him. ECF No. 26 at 5; *see Strickland*, 466 U.S. at

27

28 ---

[5] *People v. Marsden*, 2 Cal.3d 118 (1970).

1    697; *Harrington*, 562 U.S. at 111-12.  As to Buchanan's claim that Cediel was ineffective in

2    turning over discovery to the prosecutor, Buchanan has not shown that the state court's denial was

3    unreasonable, as Cediel had a legal duty to furnish discovery to the prosecutor.  *See* Cal. Pen.

4    Code § 1054.3.

5        The state court's rejection of these claims was reasonable and is entitled to AEDPA

6    deference.  These claims are DENIED.

7        **3.  Claims Related to Buchanan's Van**

8        Buchanan faults Cediel for failing to stop the sale of his van, which he contends would

9    have allowed him to look for unspecified evidence and show jurors that the doors on his van did

10   not open from the inside even if they were unlocked.[6]  ECF No. 26 at 6.  Here, the record shows

11   that Buchanan testified about the faulty door locks on his van, and argued the issue during his

12   closing argument.  ECF No. 36-15 at 86 ("they [the locks] went up and they went down, and so

13   did the windows. . . . But when I was trying to actually open it and let this person in, I couldn't.  I

14   had to roll the window down and reach outside.").  The record also shows that Cediel obtained an

15   order to preserve the van until she or her investigator could inspect it and provided Buchanan with

16   a copy of the investigator's report after he began representing himself.

17       The state trial court could reasonably deny his claim because Buchanan failed to show any

18   error or prejudice.  *See Harrington*, 562 U.S. at 104.  In addition, Buchanan and his investigator

19   were provided with contact information for the new owner and had an opportunity to conduct

20   further investigation of the van, but apparently did not do so.  To the extent that he argues that

21   Cediel rendered ineffective assistance of counsel when she purchased his van, the state court could

22   reasonably conclude that even assuming that Cediel did purchase the van, Buchanan has not

23

24   ───────────────

[6] Buchanan also makes several unsubstantiated allegations that Cediel told him she would not
25   allow Buchanan to testify, and that she colluded with the prosecutor in his case.  The claims
     appear entirely unsupported in the record, especially in light of Buchanan's *Marsden* motions.
26   Buchanan attributes ill intent to Cediel for being present in the courthouse when she was no longer
     assigned to represent him, but his claim is conclusory only.  Additionally, Buchanan argues Cediel
27   should have raised several issues during trial; however, Buchanan represented himself at trial and
     it was therefore no longer Cediel's responsibility to raise the defenses or arguments regarding his
28   alleged drug use or diminished capacity in front of the jury.

United States District Court
Northern District of California

shown why her purchase of the vehicle would rise to ineffective assistance.[7]  The state court could reasonably conclude that Buchanan did not show any prejudice, as he was able to testify about the locks and it is unclear what other evidence he could have discovered in the van, let alone any exculpatory evidence.

The state court's rejection of these claims was reasonable and is entitled to AEDPA deference.  These claims are DENIED.

### 4.  Gyretta Doe Trial Transcript

Buchanan contends that Cediel rendered ineffective assistance when she failed to obtain trial transcripts from his prior conviction for crimes committed against Gyretta Doe, who testified at the underlying trial for the limited purpose of establishing intent or lack of mistake.  ECF No. 26 at 8.  The record shows that the trial court and prosecutor searched for and located the court file for the 1996 case and provided Buchanan with copies of its contents, including a transcript of Gyretta Doe's preliminary hearing testimony.  ECF No. 36-6 at 24-35; ECF No. 36-10 at 70; ECF No. 36-11 at 14-15.  It is unclear whether any other transcript of Gyretta Doe's prior testimony existed, and neither party provides the transcript at issue in their exhibits.

Additionally, Buchanan does not explain the nature of any potential impeachment.  *See United States ex rel. Green v. Rundle*, 434 F.2d 1112, 1115 (3d Cir. 1970) ("When a habeas petitioner alleges as a ground for relief the failure of counsel to . . . present[] specific trial evidence it is reasonable . . . to put on petitioner the burden of showing that the missing evidence would have been helpful"); *cf. Peace v. Hall*, Case No. 00-cv-1072-MJJ, 2002 WL 31689360, *4 (N.D. Cal. Nov. 26, 2022) (finding no due process violation where trial transcript for 1980 conviction was destroyed because "even if the transcript were exculpatory, the state had no reason to suspect . . . that the transcript might play a role in petitioner's defense 18 years later").  While there is no question that Buchanan was entitled upon his request to any existing transcript of Gyretta Doe's prior trial testimony, given that no such transcript has been confirmed to exist or produced

---

[7] For the same reasons, Buchanan's related claim of ineffective assistance of appellate counsel on the grounds that he should have challenged Cediel's conduct with respect to the van fails to overcome AEDPA deference.

United States District Court
Northern District of California

1   throughout the proceedings, it is unclear what else Cediel could have done to obtain it.  The state

2   court could reasonably find that Cediel's conduct was not ineffective, and that Buchanan was not

3   prejudiced by her actions.

4          The state court's rejection of this claim was reasonable and is entitled to AEDPA

5   deference.  This claim is DENIED.

6   **D.      Ineffective Assistance of Appellate Counsel**

7          Buchanan argues his appellate attorney, William Capriola, was ineffective in failing to file

8   a habeas petition challenging Buchanan's prior conviction, failing to raise claims of ineffective

9   assistance of trial counsel regarding Cediel, failing to file the entire trial record with the appellate

10  court, and failing to challenge Gyretta Doe's testimony.  ECF No. 26 at 15.  Buchanan also alleges

11  that Capriola was biased against him and that he should have followed up on a letter from the

12  Department of Corrections showing that the Superior Court's abstract of judgment contained

13  several errors.  *Id.* at 15-18.  The California Supreme Court denied the claim in a summary

14  opinion.  ECF No. 36-27 at 115.

15         The *Strickland* test applies to appellate counsel on a direct appeal as of right.  *Evitts v.*

16  *Lucey*, 469 U.S. 387, 399-400 (1985).  This is a "high bar" and "[s]urmounting" it is "never an

17  easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010); *see Wildman v. Johnson*, 261 F.3d

18  832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does not

19  constitute ineffective assistance when appeal would not have provided grounds for reversal . . . . [a

20  petitioner] cannot sustain his claim for ineffective assistance of appellate counsel because the

21  issues he raises are without merit.").

22         **1.  1996 Conviction**

23         As to Capriola's failure to challenge Buchanan's 1996 conviction, the state court could

24  reasonably deny his claim because Buchanan has not shown any error.  "[T]he right to appointed

25  counsel extends to the first appeal of right, and no further."  *Pennsylvania v. Finley*, 481 U.S. 551,

26  555 (1987).  There is no constitutional right to an attorney in any other state postconviction

27  proceedings.  *See Coleman v. Thompson*, 501 U.S. 722, 755-57, (1991) (no right to counsel on

28  appeal from state habeas trial court judgment); *Finley*, 481 U.S. at 556 (no right to counsel in state

collateral proceedings after exhaustion of direct appellate review); *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (no right to counsel when pursuing discretionary state appeal); *Ross v. Moffitt*, 417 U.S. 600, 617-18 (1974) (no right to counsel for defendant seeking to file certiorari petition in U.S. Supreme Court).  In a letter sent to Buchanan in 2015, Capriola explained to Buchanan that, without evidence of him being wrongfully convicted, it was likely too late to challenge his 1996 conviction.  *See* ECF No. 26 at 88; *In re Clark*, 5 Cal.4th 750, 797-98 (1993).  Capriola also explained that his appointment was to represent him as appellate counsel, not to "collaterally attack the judgment in [his] 1996 case."  ECF No. 26 at 88; *see Torna*, 455 U.S. at 587-88 (no ineffective assistance of counsel claim for retained counsel's failure to file timely application for discretionary state appeal when no right to counsel at such proceeding).

The state court's rejection of these claims was reasonable and is entitled to AEDPA deference.  These claims are DENIED.

### 2.    Cediel's Performance

As to the issue of failing to challenge Cediel's performance, the state court could reasonably deny these claims because Buchanan has not shown error nor prejudice.  *Wildman*, 261 F.3d at 840.  First, Capriola reasonably explained to Buchanan that he had reviewed the record and the *Marsden* hearing transcripts and concluded that Cediel was not ineffective in representing him, and even if she was, "there is nothing Ms. Cediel did or did not do that prejudiced the outcome of [Buchanan's] trial, at which [he] represented [himself]."  *Id.* at 87.  Moreover, as discussed above, the state court could reasonably conclude that Buchanan did not show prejudice based on the claim's likelihood of success.  *Wildman*, 261 F.3d at 840.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference.  This claim is DENIED.

### 3.    Accuracy and Completeness of Record on Appeal

Buchanan raises several claims related to the record on appeal.  First, Buchanan alleges that Capriola did not obtain the full record from the Superior Court or file it with the appellate court, rendering Capriola's performance ineffective.  The record shows, however, that Capriola requested missing volumes from the trial court and evidence in the record supports a conclusion

United States District Court
Northern District of California

that he received them.  *See* ECF No. 26 at 15-16; ECF No. 36-16; ECF No. 36-17; ECF No. 36-18.

Buchanan also argues that Capriola was ineffective in failing to raise an appellate claim regarding CDCR's letter to the trial court, which noted missing and incorrect information in the abstract of judgment.  *See* ECF No. 26 at 112.  Specifically, the abstract of judgment did not indicate whether Buchanan was sentenced under California Penal Code sections 667 or 1170.12 and incorrectly stated that Buchanan had been sentenced to a 60-year-to-life term for kidnapping with intent to commit a sex offense.  *See* ECF No. 36-1 at 113-14 (original abstract of judgment).  As Respondent points out, the issue was addressed, and the abstract was corrected after the matter was remanded to the trial court for resentencing; even assuming Capriola's performance was deficient in failing to raise the issue on appeal, the state court could reasonably find that Buchanan has shown no prejudice.  *See* ECF No. 36-28.

The state court's rejection of these claims was reasonable and is entitled to AEDPA deference.  These claims are DENIED.

### 4.  Gyretta Doe

As noted, Buchanan argues that Capriola was ineffective when he failed to obtain a transcript of Gyretta Doe's testimony, Buchanan has not shown that Capriola was obligated to do so in connection to his representation of Buchanan, or that it was possible for Capriola to do so.  Buchanan also appears to argue that Capriola should have challenged the admission of Gyretta Doe's testimony as unduly prejudicial.  ECF No. 26 at 20.  Before Buchanan's trial, Cediel moved unsuccessfully attempted to bar Gyretta Doe from testifying.  ECF No. 36-6 at 56.  Cediel argued that the facts in Gyretta Doe's assault and the attempted assault against Jane Doe were dissimilar, and that the conduct was remote, not probative, and prejudicial.  *Id.*

The trial court rejected Cediel's motion to exclude the evidence and found the evidence was admissible under California Evidence Code section 1101(b) to show Buchanan's intent.  ECF No. 36-6 at 92-95.  The trial court found both crimes were crimes of opportunity and involved intoxicated women who were "lur[ed]" by Buchanan's sympathy before the situation evolved into one where the women did not feel free to leave.  *Id.* at 93.  The trial court also found that the assault against Gyretta Doe, although committed 22 years prior, was not remote given that

1    Buchanan had been imprisoned the majority of that time. *Id.* at 94. The evidence was deemed

2    more probative than prejudicial and allowed to move forward with a limiting instruction

3    specifying that the conduct could only be considered in proving intent, motive, absence of

4    mistake, or common scheme. *Id.* at 95.

5         "Evidence of [prior] crimes is admissible to prove identity, common plan, and intent 'only

6    if [the prior and current crimes] are sufficiently similar to support a rational inference' on these

7    issues." *People v. Edwards*, 57 Cal.4th 658, 711 (2013). The prior crimes' probative value must

8    substantially outweigh any potential prejudicial effect. *See* Cal. Pen. Code § 352. California

9    appellate courts consider the admission of prior crimes evidence under California Penal Code

10   section 1101(b) under a standard of abuse of discretion. *People v. Foster*, 50 Cal.4th 1301, 1328-

11   29 (Cal. 2010). "Under the abuse of discretion standard, 'a trial court's ruling will not be

12   disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an

13   arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."

14   *People v. Hovarter*, 44 Cal.4th 983, 1004 (Cal. 2008).

15        Here, the trial court found that the crimes were similar enough to be probative on the issue

16   of intent based on the nature of the crimes, the vulnerability of the intoxicated victims, and

17   Buchanan's actions leading to the assaults, and the evidence of Buchanan's intent was contested at

18   trial. Moreover, the state court could reasonably conclude that Buchanan failed to show that the

19   trial court abused its discretion in admitting the evidence, and that the claim would likely have

20   been unsuccessful even if raised on appeal. *Wildman*, 261 F.3d at 840; *cf. Mejia v. Garcia*, 534

21   F.3d 1036, 1046 (9th Cir. 2008) (admission of propensity evidence of criminal defendant's prior

22   uncharged sexual assault did not violate due process and was not contrary to clearly established

23   federal law).

24        The state court's rejection of this claim was reasonable and is entitled to AEDPA

25   deference. The claim is DENIED.

26        **5. Bias**

27        Finally, as to Buchanan's contention that Capriola was biased against him, the claim is

28   entirely unsupported. Capriola's letters, which constitute the sole evidence of his relationship with

United States District Court
Northern District of California

1    Buchanan, show that he corresponded numerous times with Buchanan, answered his questions,

2    explained why Capriola did not raise certain issues, and corresponded professionally with

3    Buchanan.  *See* ECF No. 26 87-94.

4         The state court's rejection of this claim was reasonable and is entitled to AEDPA

5    deference.  The claim is DENIED.

6    **E.     Prosecutorial Misconduct**

7         Buchanan argues that the prosecutor in his case engaged in misconduct by including

8    incorrect information about Buchanan's prior convictions in a background report printed from the

9    Alameda County Criminal Records Information Management System (ACCRIMS) and by

10   "suppressing" evidence that Buchanan had methamphetamine in his van when he was arrested,

11   both of which are allegedly unexhausted.  ECF No. 26 at 21-24.  Buchanan also argues that the

12   prosecutor "vindictively" prosecuted him for sex crimes instead of possession of

13   methamphetamine; charged him with failure to register as a sex offender; charged him with a

14   parole violation; and tried to prevent Buchanan from calling witness Stephen Anderson.  *Id.*

15   Buchanan also argues the prosecutor was vindictive because police failed to test Buchanan for

16   drugs or take him to a detox facility upon his arrest.  *Id.*  The California Supreme Court denied the

17   claims in a summary opinion.  ECF No. 36-27 at 115.

18        A defendant's due process rights are violated when a prosecutor's misconduct renders a

19   trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Under *Darden*,

20   the first issue is whether the prosecutor's remarks or conduct were improper; if so, the next

21   question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d

22   1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 768 F.3d 1015, 1023 (9th Cir. 2014)

23   (recognizing that *Darden* is clearly established federal law regarding prosecutors' improper

24   comments for AEDPA review purposes).  A habeas petitioner is not entitled to relief unless the

25   alleged misconduct "'had substantial and injurious effect or influence in determining the jury's

26   verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*,

27   328 U.S. 750, 776 (1946)).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.  Claims Implicating Buchanan's Actions

At the outset, several of Buchanan's claims appear to challenge the admission or exclusion of evidence or information resulting from his own actions.  For example, he argues that he was prejudiced by Kacalek's report, which incorrectly stated that Buchanan's prior conviction for forced oral copulation involved a minor under fourteen years of age.  ECF No. 36-12 at 228. However, the report was not in evidence until Buchanan raised the issue for the first time during his cross-examination of Kacalek by referencing it, asking repeatedly whether he was sure Buchanan was convicted of oral copulation with someone under the age of fourteen, and then accusing Kacalek of falsifying the document to mislead the jury.  *Id.* at 229-32.

Similarly, Buchanan faults the prosecutor for exclusion of evidence that methamphetamine was found in Buchanan's van when he was arrested, and for police's failure to drug test him or send him to a detox facility following his arrest, arguing that evidence of the methamphetamine and a drug test could have shown he had diminished capacity to form intent.  The trial court excluded the evidence as a result of the defense's motion; further, after opening the door on the subject at trial, Buchanan testified that the victim, Jane Doe, brought the methamphetamine and pipe into his car and began smoking it.  ECF No. 36-14 at 226.  He also testified that he rejected her offer to partake.  *Id.* at 228.

As to both of these claims, Buchanan appears to have invited any error through his own cross-examination and testimony.  Accordingly, Buchanan has not shown that the prosecutor's conduct was improper or that any actions by the prosecutor rendered the trial unfair.  *See Darden*, 477 U.S. at 181; *Brecht*, 507 U.S. at 637.  The state court's rejection of these claims was reasonable and is entitled to AEDPA deference.  These claims are DENIED.

### 2.  Vindictive Prosecution

As noted, Buchanan asserts that the prosecutor vindictively charged him with several sex crimes, including the failure to register as a sex offender, and a parole violation.  A prosecutor violates a defendant's due process rights when he brings additional charges solely to punish the defendant for exercising a constitutional or statutory right.  *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).  The petitioner has the burden to show that "charges of increased severity were

filed because the accused exercised a statutory, procedural, or constitutional right in circumstances that give rise to an appearance of vindictiveness." *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1168 (9th Cir. 1982).

Buchanan has made no such showing here. Crucially, Buchanan has not shown that his exercise of any constitutional or statutory right led to additional charges. *See Gallegos-Curiel*, 681 F.2d at 1168. Moreover, to the extent that he alleges he was vindictively charged with a parole violation, the Court notes that there is no evidence in the record of such charge. The charge for failure to register appears to have been supported by the evidence introduced at trial, which showed that Buchanan failed to register when he relocated from Richmond, California, to Berkeley, California, within five days of moving. *See* ECF No. 26-15 at 25. As to the claim related to police officers' failure to drug test Buchanan upon his arrest, the Court is unaware, and Buchanan does not cite, any federal law suggesting that the prosecution of someone who was not drug tested upon arrest constitutes vindictive prosecution. Rather, Buchanan appears to disagree with his culpability for his convicted crimes. The state court could reasonably deny this claim on the basis that Buchanan failed to show vindictiveness.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

### 3. Character Witness

Buchanan also argues that the prosecutor committed misconduct by attempting to bar testimony from character witness Stephen Anderson. However, Anderson testified at trial over the prosecutor's objection, and the state court could reasonably deny this claim as Buchanan cannot show prejudice.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

### 4. Perjured Testimony

Finally, to the extent Buchanan contends that the prosecutor used perjured testimony, the claim is conclusory only. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.");

1  *Beard v. Clarke*, 18 Fed. Appx. 530, 531 (9th Cir. 2001).

2       The state court's rejection of this claim was reasonable and is entitled to AEDPA

3  deference.  The claim is DENIED.

4  **F.  Due Process/Fairness**

5       Buchanan argues that he was denied due process due to several errors, including when the

6  trial court failed to sua sponte appoint advisory counsel and when Cediel "destroyed and/or

7  permanently lost evidence."  ECF No. 26 at 26.  Buchanan also appears to argue that his due

8  process rights were violated when the trial court "denied [him] the constitutional guarantee of a

9  meaningful opportunity to present a complete defense"; when the trial court refused to let his

10  investigator sit at counsel table and instead required the passing of notes through a court attendant;

11  and when the jail provided him with an invalid phone pin number, which prevented him from

12  calling his investigator.  *Id.* at 26-39.  Respondent contends that the claims related to Buchanan's

13  alleged lack of access to his investigator are unexhausted.  ECF No. 35 at 36.  The California

14  Supreme Court denied the claims in a summary opinion.  ECF No. 36-27 at 115.

15     **1.  Advisory Counsel**

16       As noted, Buchanan argues that his due process rights were violated by the trial court's

17  failure to sua sponte appoint advisory counsel.[8]  ECF No. 26 at 26.  A defendant who waives his

18  right to counsel does not have a constitutional right to the appointment of advisory counsel, and

19  the decision whether to appoint advisory or standby counsel is squarely within the trial court's

20  discretion.  *See United States v. Moreland*, 622 F.3d 1147, 1155 (9th Cir. 2010); *Locks v. Summer*,

21  702 F.2d 403, 407-08 (1983).  Notably, Buchanan does not argue that his waiver of his right to

22  counsel was not voluntary, but rather that the trial court erred in failing to appoint advisory

23  counsel sua sponte.  ECF No. 26 at 26.  Buchanan did not request the appointment of advisory

24  counsel, and the state court could reasonably find that the trial court had no duty to appoint

25  ───────────────

26  [8] In California, advisory counsel "actively assists the defendant in preparing the defense case by
performing tasks and providing advice pursuant to the defendant's requests, but does not

27  participate on behalf of the defense in court proceedings," while standby counsel "takes no active
role in the defense, but attends the proceedings so as to be familiar with the case in the event that

28  the defendant gives up or loses his or her right to self-representation."  *People v. Moore*, 51 Cal.
4th 1104, 1119 n.7 (2011).

United States District Court
Northern District of California

advisory counsel on its own motion given Buchanan's dismissal of two defense attorneys and insistence on driving his own defense. *See Moreland*, 622 F.3d at 1155; *cf. United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) (no abuse of discretion where trial court denied request for advisory counsel after criminal defendant sought removal of two defense attorneys prior to making request to proceed pro se and for advisory counsel). Moreover, while the trial court did not appoint advisory counsel, it sua sponte appointed standby counsel. ECF No. 36-6 at 166-67. The state court could reasonably deny this claim because Buchanan has shown no error.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

### 2. Lost Evidence

Buchanan argues that Cediel lost evidence and discovery, and that the loss of the evidence in question led to an unfair trial. The Court notes that the trial court addressed the matter extensively. After Buchanan filed a written motion listing various documents he was allegedly missing from the discovery provided to him by Cediel after he chose to proceed pro se, the trial court, prosecutor, and Buchanan's investigator looked into the matter; the trial court later clarified on the record that "all discovery was returned to the D.A.'s Office when Mr. Buchanan went pro per, and any internal investigation was given to Mr. Buchanan. [Buchanan's] investigator is also confirming that the content of the request contained in [his] motion are items that [he has] already received." ECF No. 36-11 at 74-75. The state court could reasonably deny this claim based on Buchanan's failure to show any error.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

### 3. Complete Defense

As to Buchanan's assertion that he was denied the ability to present a complete defense, the claim is conclusory. *See James*, 24 F.3d at 26.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

### 4. Pro Se Pin Number

To the extent that Buchanan argues that his right to due process was violated when he was unable to use his phone pin number to call his investigator during trial, the Court notes that regardless of any temporary issues Buchanan had contacting the investigator by phone, in Buchanan told the trial court that he was able to speak to and meet with his investigator throughout the time period that the pin number was not working. *See* ECF No. 36-11 at 147-48 ("[THE COURT:] Did you have an opportunity to meet physically with your investigator? MR. BUCHANAN: Yes, Your Honor. I think last week . . . we talked and then this weekend, . . . he came out and actually visited me, and we did as much as we can do. THE COURT: I wanted to make sure there was no interruption in the preparation of the case. MR. BUCHANAN: Thank you, Your Honor."); *see Brown v. Trejo*, 818 Fed. Appx. 599 (9th Cir. 2020) (in civil rights case, holding that prisoner's loss of pin number with pro per phone funds did not interfere with prisoner's access to courts where prisoner does not show any impact on criminal case). No colorable claim appears.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

### 5. Courtroom Seating Arrangement

Buchanan also argues that the seating arrangements in the courtroom and the trial court's arrangement during trial that Buchanan and the investigator to exchange written communications through a court attendant violated his right to due process or to put on a defense. The state court could reasonably deny this claim because Buchanan has not shown that he was entitled to having his investigator sit next to him throughout trial or that the trial court's use of a neutral court attendant, which the judge explained would ensure that any materials shared with Buchanan complied with the trial court's standing protective order, interfered with his ability to utilize his investigator. *See* ECF No. 36-10 at 281; *see also United States v. Brugnara*, 856 F.3d 1198, 1210 (9th Cir. 2017) (noting that pro se criminal defendant's right to reasonably access tools to prepare a defense is not unlimited and must be balanced against prison's legitimate security needs or resource constraints); *see also Schwerdtfeger v. Lamarque*, 2003 WL 22384765, *13 (N.D. Cal.

1    Oct. 8, 2003) (noting that trial court could "properly require [pro se criminal defendant] to follow

2    proper procedures and substantiate his requests" in utilizing pro se resources).  No colorable claim

3    appears.

4        The state court's rejection of this claim was reasonable and is entitled to AEDPA

5    deference.  The claim is DENIED.

6    **G.    Juror Misconduct**

7        Buchanan argues the trial court erred in failing to excuse several jurors for alleged

8    misconduct.  Buchanan argues that Juror No. 3 should have been dismissed after he notified the

9    trial court that he had inadvertently read the headline on a story about Buchanan's trial.  ECF

10   No. 26 at 29.  He also argues that a different juror, presumably Juror No. 1, should have been

11   excused after the juror "express[ed] displeasure/annoyance with [Buchanan] . . . being

12   able/allowed to cross-examine [Gyretta Doe]."  *Id.* at 30.  Finally, he makes several

13   unsubstantiated claims of juror misconduct.  The California Supreme Court denied the claims in a

14   summary opinion.  ECF No. 36-27 at 115.

15       The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of

16   impartial jurors.  U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "Even if

17   only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an

18   impartial jury."  *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (quotations omitted).

19       The Constitution "does not require a new trial every time a juror has been placed in a

20   potentially compromising situation."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  The safeguards

21   of juror impartiality, such as voir dire and protective instructions from the trial judge, are not

22   infallible; it is virtually impossible to shield jurors from every contact or influence that might

23   theoretically affect their vote.  *Id.*  Due process only means a jury capable and willing to decide

24   the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial

25   occurrences and to determine the effect of such occurrences when they happen.  *Id.*  Such

26   determinations may properly be made at a hearing.  *Id.*

27       **1.  Juror No. 3**

28       As to Juror No. 3, the issue arose when the juror sent the judge a note stating "Your Honor,

United States District Court
Northern District of California

28

I'm very sorry, but I must tell you, I saw a headline about this trial in the paper. I didn't read any stories about this trial. Again, I'm sorry for the transgression." ECF No. 36-12 at 13. After discussing the issue with the parties, the trial court brought the juror into the courtroom for questioning:

> [**THE COURT:**] Thank you so much for your note. It appears that you have been quite conscientious in letting us know that you happened to peruse the newspaper. Can you tell me what it was that you saw?
>
> **JUROR NO. 3:** On Saturday, I saw the headline that just had the defendant's name, and then this morning – this was in the local section of the East Bay News – and this morning I saw the headline about the charges and the possible penalty.
>
> **THE COURT:** I see. Now, then, and the possible penalty was in the headline?
>
> **JUROR NO. 3:** Yes.
>
> **THE COURT:** Anything about what you have read you feel would impact you in being fair and impartial to both sides in this case, understanding that the Court has shared with you that you cannot take into consideration punishment or penalty? And oftentimes what we see in the print media may not be a fair representation of what the actual law says and/or what the parameters are for the Court. Will you be able to set aside what you have read in the newspaper and judge this case solely on the facts that you hear in this courtroom?
>
> **JUROR NO. 3:** Yes.
>
> **THE COURT:** Do you think anything that you have read had had any impact on your impartiality?
>
> **JUROR NO. 3:** No.
>
> **THE COURT:** Counsel for the People?
>
> **MR. HERNANDEZ:** I don't have any further questions. Thank you.
>
> **THE COURT:** Mr. Buchanan, do you have any questions, sir?
>
> **MR. BUCHANAN:** Only one question. So, you said you didn't read the article. You just saw the headline, is that correct?
>
> **JUROR NO. 3:** At the beginning I didn't hear what you said. You said – what did you say?
>
> **THE COURT:** There were two articles on two separate dates. One was Saturday and one was read this morning.
>
> **JUROR NO. 3:** I just turned the page.
>
> **MR. BUCHANAN:** I see. It's okay. No problem. I mean no questions, Your Honor.
>
> **THE COURT:** All right. Any motions?
>
> **MR. HERNANDEZ:** No, Your Honor.
>
> **MR. BUCHANAN:** No, Your Honor.

ECF No. 36-12 at 14-16.

Buchanan argues that the juror should have been removed for cause based on implied or

29

1  actual bias.  The discussion with Juror No. 3, however, indicates no such bias.  The juror saw a

2  reference to Buchanan's name and his potential sentence only.  The trial court admonished the

3  juror that he could not consider possible penalty, explained that information in the media may not

4  be a fair representation of the law, and that he needed to judge the case solely from the facts heard

5  at trial.  The juror assured the trial court and parties that he could do so and that reading the

6  headline did not impact his impartiality, which the trial court apparently accepted.  *Perez v.*

7  *Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997) (a trial court's determinations as to fitness of jurors

8  are entitled to deference on habeas review); *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975)

9  (declining to overturn conviction where six jurors had read news coverage about criminal

10  defendant's case, including information about his prior murder conviction, based on *voir dire*

11  showing no evidence of bias, "largely factual . . . nature" of the news coverage, and lack of

12  inflammatory atmosphere in the courtroom).  Buchanan does not point to any evidence suggesting

13  otherwise.  To the contrary, the record shows that the juror agreed to follow the law, and

14  Buchanan did not lodge any objections related to the juror[9]; under these circumstances, the state

15  court could reasonably find that no error occurred.

16       The state court's rejection of this claim was reasonable and is entitled to AEDPA

17  deference.  The claim is DENIED.

18      **2.  Juror No. 1**

19       As noted, Buchanan also argues that a juror committed misconduct in expressing

20  displeasure or annoyance with Buchanan's questioning of Gyretta Doe.  The record shows that

21  Juror No. 1 sent the trial court two notes simultaneously, including one expressing irritation about

22  Buchanan's cross-examination of Gyretta Doe.  ECF No. 36-10 at 190-91.  The first note stated:

23          Mr. Buchanan seems to be ill prepared.  A lot of time is wasted by
        him searching for questions that have little or no relevance to this

24          case.  His tactic of stalling is becoming irritating to many of the jury.
        Can anything be done about his lack of preparation or organization?

25      *Id.*

26       The second note, referenced by Buchanan, stated:  "What is the point of having

27  —————————————————

28  [9] Buchanan argues in his petition that he did not make a motion to excuse the juror during *voir dire* because he did not hear what the juror said.

1    Ms. Gyretta Doe rehash her ordeal from 22 years ago?  It seems cruel.  Wasn't he convicted of the

2    crime?"  ECF No. 36-10 at 191.  The trial court, the presence of the parties, spoke to Juror No. 1

3    and asked whether jurors had been speaking to each other about Buchanan's pro se status or about

4    feeling irritated, which Juror No. 1 denied multiple times; the trial court then dismissed the juror,

5    explaining that it was concerned by "the tone and tenor" of the notes, the "clear and pointed"

6    nature of the questions raised by the juror, and the juror's admission during questioning that she

7    had begun believing that Buchanan was stalling by cross-examining Gyretta Doe.  *Id.* at 198.

8    Accordingly, to the extent he contends the juror should have been dismissed, the issue is moot.

9         The state court's rejection of this claim was reasonable and is entitled to AEDPA

10   deference.  The claim is DENIED.

### 3.  Jurors' Discussions with Non-parties

12        Buchanan's also raises several related claims, including that unspecified jurors read

13   multiple articles containing unspecified information, that Buchanan had information that Cediel

14   spoke to jurors in the courthouse, and that the trial court failed to control reporters who spoke to

15   jurors in the courtroom.  These claims have no support in the record.  Moreover, as a threshold

16   matter, Buchanan's allegation that jurors and non-parties communicated with each other does not

17   in itself show any misconduct, and the state court could reasonably conclude that Buchanan failed

18   to show any error.  Even if Buchanan had arguably shown any error, to the extent that he knew

19   about the juror misconduct during his trial and did not raise the issue, the state court could

20   reasonably have concluded that he waived the issue.  *See People v. Stanley*, 39 Cal.4th 913, 950

21   (2006); *see also Jones v. Nat'l Railroad Passenger Corp*., 2025 WL 1410707, *9 (N.D. Cal. May

22   15, 2025) ("The Eleventh Circuit has explained that '[o]ur cases teach that "a defendant cannot

23   learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and

24   then complain in a post-verdict motion that the verdict was prejudicially influenced by that

25   misconduct."'  *United States v. Bollinger*, 837 F.2d 436, 438-39 (11th Cir. 1988).")

26        The state court's rejection of this claim was reasonable and is entitled to AEDPA

27   deference.  The claim is DENIED.

28

United States District Court
Northern District of California

**H.    Right to Confrontation**

Buchanan argues that his Sixth Amendment right to confrontation was violated when he was not allowed to cross-examine Jane Doe about a voicemail she left for her father on the night of the incident, where she had stated she "kissed a boy."  ECF No. 26 at 41.  Buchanan also contends his right to confrontation was violated when he was not allowed to cross-examine Doe about a "prior false claim or rape."  *Id.*  The California Supreme Court denied the claims in a summary opinion.  ECF No. 36-27 at 115.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (holding that right to confrontation also applies to states through Fourteenth Amendment).  In the context of cross-examination, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see United States v. Singh*, 995 F.3d 1069, 1079-82 (9th Cir. 2021) (in federal criminal case, concluding that the district court did not abuse its discretion in limiting cross-examination on two largely irrelevant impeachment issues, where defendant "made extensive use of his right to 'confront'" witness on other issues).

In deciding whether the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the Court balances the following five factors:  (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.  *Chia v. Cambra,* 360 F.3d 997, 1004 (9th Cir.2004); *Drayden v. White,* 232 F.3d 704, 711 (9th Cir.2000).  A federal court must also give due weight to the state interests underlying the evidentiary rules used to exclude the evidence in question.  *See Chia,* 360 F.3d at 1006; *Miller v. Stagner,* 757 F.2d 988, 995 (9th Cir. 1985).  Even if exclusion of evidence amounts to constitutional error, in order to justify federal habeas relief, the erroneous exclusion must have had "a substantial and injurious

United States District Court
Northern District of California

effect" on the verdict. *Brecht,* 507 U.S. at 623.  Habeas petitioners must therefore establish that the error resulted in "actual" prejudice. *See id.*

First, as to Jane Doe's voicemail to her father, Respondent correctly notes that Buchanan did cross-examine Doe about her statement, and the record suggests that the jury heard the voicemail in question.  *See* ECF No. 36-11 at 99 (noting that jury had heard voicemail recordings from Jane Doe's father's phone and asking Doe whether she left a voicemail saying that she "had kissed a boy and [she] felt bad because [she] had a boyfriend").  Buchanan has therefore identified no possible prejudice.  *See United States v. Urena,* 659 F. 3d 903, 907-08 (9th Cir. 2011) (limitation on cross-examination does not violate Confrontation Clause unless it limits relevant testimony and prejudices the defendant by denying the jury sufficient information to appraise the biases and motivations of the witness).

As to the trial court's ruling barring Buchanan from cross-examining Jane Doe regarding the prior alleged false claim or rape, the parties argued the issue during motions during limine. *See* ECF No. 36-7 at 137-47.  Buchanan asked to introduce evidence that Jane Doe told her victim witness advocate that she had an encounter with a member of her singing group, which was characterized as sexually assaultive in nature; it had occurred a year prior, but Jane Doe did not report it to police.  *Id.* at 137.  Buchanan argued that Jane Doe's statements to her victim witness advocate were relevant to her credibility because it would support his own claim that Doe told him she had been raped when they first met; he also argued that evidence of the statement would show that she was either confused about who and when a rape occurred or had a history of making false accusations.  *Id.* at 141-43.

The trial court disagreed, stating:

> As to any prior incident that went unreported, there is no nexus to this case, in that it occurred a year prior and I have not heard any evidence that she is in any way confusing or blurring the events of those two episodes, meaning what occurred with her singing group. . . . So, with that in mind, without there being something more, it does not appear to be relevant to these proceedings.  But I will allow for a brief 402 hearing with offered questions by both parties for the victim as it relates to that incident . . . .

ECF No. 36-7 at 145-46.  The trial court further clarified:

> *[I]f there is a stronger offer of proof, the Court will entertain it.* But
> as I indicated thus far, the tenuous information that I have is that it's
> a year old. I don't have any details as to whether there was any direct
> interaction with she and another person, and what the extent of that
> interaction was. And there is some conclusory language that it was
> sexually assaultive in nature. And again I don't know whether it was
> verbal, physical or otherwise.

ECF No. 36-7 at 147 (emphasis added).

Buchanan does not explain why the trial court's ruling, based upon Buchanan's vague offer of proof, was incorrect. California Evidence Code section 782 provides that a party seeking to introduce evidence of a complaining witness' sexual conduct must file a written motion and provide an offer of proof as to its relevance, and "[i]f the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury." Cal. Evid. Code § 782(a)(3). The key issue is whether the evidence is relevant to the witness' credibility. Cal. Evid. Code §§ 780, 782.

Here, the trial court found that the evidence appeared irrelevant based on Buchanan's vague offer of proof, which was not enough for the trial court to determine whether the circumstances from the unreported incident resembled Jane Doe's statements to police regarding Buchanan such that it could support a theory that Jane Doe was confused or blurring details from the prior incident. To the extent Buchanan argues that the evidence would have shown Jane Doe had made prior false allegations of rape, there is no evidence in the record to support his contention that it was false. Moreover, there was ample evidence in the record that Buchanan used to attack Jane Doe's credibility, including her severe intoxication at the time of the incident, her bizarre statements to witnesses and police officers who responded to the scene, and inconsistent statements. The state court could reasonably find that the proffered evidence of Doe's prior incident with a member of her singing group appears to have questionable probative value, little capacity for evaluation, and no obvious relevance to Buchanan's defense. *See Chia,* 360 F.3d at 1004.

The state court's rejection of these claims was reasonable and is entitled to AEDPA deference. These claims are DENIED.

**I.    Jury Instructions**

Buchanan contends that the trial court violated his due process rights when it failed to sua sponte instruct the jury with CALCRIM No. 3500, a unanimity instruction, for Count 2 (assault with intent to commit a sex offense).  ECF No. 26 at 41.  The California Court of Appeal denied the claim in a reasoned opinion, and the California Supreme Court denied review.  *See* ECF No. 36-22 at 8-9; ECF No. 36-25 at 47.

The California Court of Appeal denied Buchanan's claim on the basis that the two potential assaultive actions in question were part of a continuous course of conduct:

> "[W]hen violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty.  There are, however, several exceptions to this rule.  For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' . . .  Here, no unanimity instruction was required because the acts forming the basis for count 2 were "'so closely connected as to form part of one transaction.'"  [*People v. Benavides*, 35 Cal.4th 69, 98 (2005).]  Doe was in the car for a total of 30 minutes.  While she was in the car, Buchanan covered her mouth to muffle her scream, and they briefly struggled as she tried to remove his hand.  Then Doe climbed into the backseat of the van.  Shortly thereafter, Doe attempted to climb out of the window.  As she tried to escape, Buchanan pulled on Doe's legs.  The two acts—covering Doe's mouth and pulling on her legs—occurred in a short period of time, in the same location.  Accordingly, the acts were so closely connected as to form one transaction.

ECF No. 36-22 at 8-9 (citations omitted).

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A jury instruction that reduces the level of proof necessary for the government to carry its burden violates the constitutional right to a jury verdict of guilt beyond a reasonable doubt.  *See Sullivan v. Louisiana*, 508 U.S. 275, 278-82 (1993).

To the extent that the lack of unanimity instruction arguably could violate the Constitution, the Court notes that at the time the California Supreme Court adjudicated the petition for review,

federal law did not recognize a federal constitutional right to a unanimous verdict in state criminal trials. *See Apodaca v. Oregon*, 406 U.S. 4040, 406-14 (1972). After Buchanan's conviction became final, the Supreme Court recognized the right to such instruction for state court criminal defendants. *See Ramos v. Louisiana*, 590 U.S. 83 (2020). The *Ramos* rule does not, however, apply retroactively to federal habeas claims. *Edwards v. Vannoy*, 593 U.S. 255, 258-59 (2021).

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

## J.    Sentencing Claims

Buchanan argues that his sentence is illegal. ECF No. 26 at 43. Specifically, Buchanan argues that his bifurcated trial on his prior convictions was unfair; that he should not have been sentenced under California Penal Code section 667.71; that his consecutive terms were "inappropriate" because there was no evidence that he had the requisite intent on the kidnapping count; and that his sentence is cruel and unusual under the Eighth Amendment. *Id.* at 43-44. The California Supreme Court denied the claims in a summary opinion. ECF No. 36-27 at 115.

### 1.   Bifurcated Trial on Prior Convictions

Buchanan waived his right to a jury trial on his prior convictions. During a bifurcated proceeding, the prosecution presented a record of certified conviction from Buchanan's prior case. ECF No. 36-15 at 139-40. Buchanan affirmatively acknowledged that he did not object to the prosecution's evidence and did not introduce any evidence himself. *Id.* at 141-43. Instead, Buchanan argued that he should have only been convicted of a single count of forcible rape and a single count of forced oral copulation in 1996 because everything was part of one course of conduct. *Id.* The trial court found true that Buchanan had three forcible rape priors and two forcible oral copulation priors. *See* ECF No. 36-15 at 139-45.

To the extent that Buchanan argues the prior convictions were found in violation of his due process rights because he did not receive a transcript of Gyretta Doe's trial testimony, the Court notes that because each of the enumerated offenses categorically qualified under the statute, the factfinder needed to determine only whether Buchanan suffered convictions for the alleged prior convictions, not the specific facts. *See* Cal. Pen. Code § 667.71(a). Moreover, Buchanan was

36

1   given an opportunity to present evidence or make any argument, but did not lodge any objections

2   to proceeding without a copy of the trial transcript for his prior convictions during the bifurcated

3   trial on the issue.  The state court could reasonably find that no error occurred, or that by failing to

4   articulate any plausible defense that could have been facilitated by the transcript, Buchanan failed

5   to show any prejudice.  *Brecht*, 507 U.S. at 637.

6       The state court's rejection of this claim was reasonable and is entitled to AEDPA

7   deference.  This claim is DENIED.

8       **2.  Penal Code § 664**

9       As to Buchanan's argument that his consecutive sentences in the instant matter were

10  "inappropriate" due to his lack of intent during the kidnapping, his argument is unavailing.

11      "[A] trial court has discretion to determine whether several sentences are to run

12  concurrently or consecutively.  In the absence of a clear showing of abuse, the trial court's

13  discretion in this respect is not to be disturbed on appeal.  Discretion is abused when the court

14  exceeds the bounds of reason, all of the circumstances being considered."  *People v. Bradford*, 17

15  Cal. 3d 8, 20 (1976), abrogated on other grounds by *Price v. Superior Court*, 25 Cal.4th 1046,

16  1065 (2001) (citations omitted).  Federal courts must defer to the state courts' interpretation of

17  state sentencing laws.  *See Bueno v. Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993).  "Absent a

18  showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does

19  not justify federal habeas relief."  *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994); *see, e.g.,*

20  *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (whether assault with deadly weapon

21  qualifies as "serious felony" under California's sentence enhancement provisions, Cal. Penal Code

22  §§ 667(a) and 1192.7(c)(23), is question of state sentencing law and does not state a constitutional

23  claim).

24      Here, the trial court noted in imposing the consecutive terms that the GPS evidence in trial

25  showed that Buchanan passed several Safeway stores after Jane Doe got into his van and before

26  she was able to escape, suggesting that Buchanan had an opportunity to consider his conduct

27  several times.  ECF No. 36-15 at 33-34.  In any event, to the extent that he is attempting to raise a

28  claim that his consecutive sentences are improper under state law, such claim is generally not

United States District Court
Northern District of California

1    cognizable in federal habeas, and he has not shown that the imposition of consecutive terms were

2    fundamentally unfair.  *See Beaty v. Stewart*, 303 F.3d 975, 986 (9th Cir. 2002).

3    The state court's rejection of this claim was reasonable and is entitled to AEDPA

4    deference.  This claim is DENIED.

5    ### 3.  Eighth Amendment

6    Buchanan argues that his sentence was cruel and unusual in violation of the Eighth

7    Amendment.  The Eighth Amendment contains a "narrow" proportionality principle.  *Graham v.*

8    *Florida*, 560 U.S. 48, 59-60 (2010).  This principle "'does not require strict proportionality

9    between crime and sentence' but rather 'forbids only extreme sentences that are grossly

10   disproportionate to the crime.'"  *Id.*; *see Solem v. Helm*, 463 U.S. 277, 303 (1983).  "[O]utside the

11   context of capital punishment, successful challenges to the proportionality of particular sentences

12   will be exceedingly rare."  *Solem*, 463 U.S. at 289-90; *see also Crosby v. Schwartz*, 678 F.3d 784,

13   795 (9th Cir. 2012).  For modern non-capital cases, the Supreme Court has held that only extreme

14   sentences that are grossly disproportionate to the crime violate the Eighth Amendment.  *United*

15   *States v. Carr*, 56 F.3d 38, 39 (9th Cir. 1995*); see Harmelin v. Michigan*, 501 U.S. 957 (1991).

16   The threshold determination in determining proportionality is whether a petitioner's

17   sentence is one of the rare cases in which a comparison of the crime committed and the sentence

18   imposed leads to an inference of gross disproportionality.  *See Norris v. Morgan*, 622 F.3d 1276,

19   1290 (9th Cir. 2010); *United States v. Bland*, 961 F.2d 123, 129 (9th Cir. 1992) (quoting

20   *Harmelin*, 501 U.S. at 1005).  Where it cannot be said, as a threshold matter, that the crime

21   committed and the sentence imposed are grossly disproportionate, a court need not engage in a

22   comparative analysis of the defendant's sentence in comparison to those received by other

23   defendants for other crimes.  *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

24   The Supreme Court has not established a "clear or consistent path for courts to follow" in

25   determining whether a particular non-capital sentence violates the Eighth Amendment.  *Lockyer v.*

26   *Andrade*, 538 U.S. 63, 72 (2003); *see, e.g.*, *Norris*, 622 F.3d at 1292-96 (concluding that sentence

27   of life without possibility of parole for conviction of first degree child molestation of 5-year-old

28   girl, where touching was brief and over clothing, was not grossly disproportionate); *Gonzalez v.*

United States District Court
Northern District of California

*Duncan*, 551 F.3d 875, 883 (9th Cir. 2008) (finding sentence of 28 years to life for petitioner's failure to meet technical requirement of updating registration as sex offender within five working days of his birthday, when he had complied with requirement to update address, leads to inference of gross disproportionality); *cf. Ewing*, 538 U.S. at 29-31 (sentence of 25 years to life for conviction of grand theft with prior convictions was not grossly disproportionate); *Harmelin*, 501 U.S. at 1005 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality); *see also Patsalis v. Shinn*, 47 F.4th 1092, 1101 (9th Cir. 2022) (petitioner convicted of dozens of felonies, including residential burglaries, sentenced to consecutive sentences resulting in overall sentence of 292 years did not violate Eighth Amendment despite harshness); *Iversen v. Pedro*, 96 F.4th 1284, 1286-90 (9th Cir. 2024) (upholding life without parole sentence under state's sex offender recidivism statute after petitioner pleaded guilty to public indecency based on the gravity of the offense and extensive history of sex offenses and other criminal charges, including five prior convictions for public indecency, rape, sodomy, multiple assaults, attempted burglary, and methamphetamine possession).

Here, Buchanan was convicted of serious crimes, including kidnapping to commit a sex offense, assault with intent to commit a sex offense, and failure to register as a sex offender; he was sentenced as a habitual sexual offender based on his five prior sex offenses, which included three forcible rape convictions. Buchanan committed the underlying crimes while on parole for his prior conviction only three years after his release from prison. Buchanan's sole argument as to mitigating circumstances – that he was high on methamphetamine at the time he committed the underlying crimes – is not supported by his own testimony at trial and was not offered as a consideration during sentencing. *See* ECF No. 36-15 at 153. Accordingly, given the seriousness of each of the prior and underlying convictions, the Court concludes that the sentence does not give rise to an inference of gross disproportionality. *See Iversen*, 96 F.4th at 1286-90; *Patsalis*, 47 F.4th at 1101.

The state court's rejection of these claims was reasonable and is entitled to AEDPA deference. These claims are DENIED.

1

**CONCLUSION**

2      The state court's adjudication of Buchanan's claims did not result in decisions that were

3  contrary to, or involved an unreasonable application of, clearly established law; nor did they result

4  in decisions that were based on an unreasonable determination of the facts in light of the evidence

5  presented in the state court proceeding.  The petition for writ of habeas corpus is DENIED.

6      A certificate of appealability will not issue.  Buchanan has not shown that "jurists of

7  reason would find it debatable whether the petition states a valid claim of the denial of a

8  constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Buchanan may seek a

9  certificate of appealability from the Ninth Circuit Court of Appeals.

10      The Clerk shall enter judgment in favor of respondent and close the file.

11      **IT IS SO ORDERED.**

12  Dated: August 27, 2025



William H. Orrick
United States District Judge